J-A28002-19

2020 PA Super 53

| | | |
|---|---|---|
| IN THE INTEREST OF: S.C., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.C., MOTHER | : : : : : : : | |
| | : | No. 1737 EDA 2019 |

Appeal from the Order Entered May 23, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0002101-2018

BEFORE: PANELLA, P.J., STABILE, J., and COLINS, J.[*]

OPINION BY PANELLA, P.J.: **FILED MARCH 06, 2020**

M.C. ("Mother") appeals from the order entered May 23, 2019, adjudicating her minor daughter, S.C. ("Child"), born in July 2003, dependent, and finding that Mother had committed child abuse.[1] We affirm.

The trial court discussed the factual and procedural history:

On April 12, 2018, the Department of Human Services ("DHS") received a Child Protective Services ("CPS") report alleging that [D.S., Child's stepfather ("Stepfather")] had sexually molested Child. These underlying allegations were based upon text messages between Stepfather and Child that were provided to DHS by Child's aunt. DHS subsequently interviewed Child's

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] On April 9, 2019, following a January 18, 2019 guilty plea to unlawful contact with a minor and endangering the welfare of a child, the court found D.S. ("Stepfather") a perpetrator of child abuse. Stepfather did not appeal the finding or the adjudication of dependency.

Mother does not challenge the finding of dependency, but solely the finding of child abuse.

siblings who told DHS that they slept in the same room as [Child] and Stepfather. The CPS report indicated that Child and Stepfather shared the same bed separate from the other siblings. The other siblings also told DHS that Mother left the children to live alone with Stepfather in the summer of 2017. []

Investigators presented to Child text messages between Child and Stepfather which suggested that they were having sex. Child[, when presented with these text messages,] became evasive and admitted to sleeping in the same bed as Stepfather. Thereafter, Child changed her story[,] telling DHS that she slept in the same room as Stepfather but on an air mattress adjacent [to] Stepfather's bed. This sleeping arrangement, however, remained suspect[,] especially given that the home had three bedrooms. []

A DHS investigation of Stepfather indicated that he had an extensive history of sexual abuse. Ultimately, Stepfather entered a guilty plea on January 18, 2019 [to] felony unlawful contact with a minor[.] Stepfather was sentenced to three years of incarceration. Child was the victim in this case.

*See* Trial Court Opinion, 8/20/19, at 1-2 (internal citations to the record and unnecessary capitalization omitted).

DHS filed a dependency petition as to Child on September 24, 2018. In Spring 2019, the court held two adjudicatory hearings. At the beginning of the first hearing, the court admitted into evidence, without objection, a certified copy of Stepfather's criminal history and a transcript of his guilty plea. *See* N.T., 4/9/19, at 10-11. Stepfather had entered a guilty plea to felony corruption of a minor and endangering the welfare of a child. *See id.* at 11. Stepfather was sentenced to three and one-half to seven years of incarceration. *See id.* Additionally, the court took judicial notice of a letter authored by Child in which she denied that any abuse had occurred. *See id.* at 36.

DHS presented the testimony of Edward Lolly, DHS social worker and sexual abuse investigator; and Alonzo Lyas, DHS social work service manager. *See id.* at 1-32. Lolly testified that he has been an employee of DHS for eleven years, and a sexual abuse investigator for five years. *See id.* at 13-14. He became involved with the family after receiving a CPS report regarding concerns of sexual misconduct between the fourteen-year-old Child and Stepfather, her caregiver at the time. *See id.* at 14. Lolly's ultimate conclusion was that the report could not be deemed indicated, because Child completed a forensic interview and denied that anything inappropriate had happened.[2] *See id.*

However, the report was deemed to be founded based upon inappropriate text messages that had been exchanged between Child and Stepfather. *See id.* at 14-15.[3] The text messages that Stepfather sent to Child were admitted by way of the transcript from his January 18, 2019 guilty plea in DHS Exhibit #2. *See id.* at 10-11. In the text messages, Stepfather asked Child to "have some fun," stated that "we can do it in the kitchen," "I am going to touch that butt," and "I'm coming to get some tonight." *See id.*

When first shown the text messages, Child put her head down and said she would agree to tell the truth within twenty-four hours. *See id.* at 20.

---

[2] A report of child abuse is deemed indicated if a state agency determines that substantial evidence exists to support the allegation of abuse. *See* 23 Pa.C.S.A. § 6303.

[3] A report of child abuse is deemed founded if a court has premised an adjudication on findings or admissions of abuse. *See* 23 Pa.C.S.A. 6303.

Child insisted that the text messages were Stepfather preparing her how to respond on social media if boys approached her inappropriately. *See id.* at 17.

Lolly examined the family's home to determine sleeping arrangements. *See id.* at 20-21. In addition to Child, Mother has a minor son, C.C.; together, Mother and Stepfather have two biological minor children, D.S. and M.S. *See id.* at 18.

The home had three bedrooms; D.S. slept in the back bedroom; Stepfather claimed that Child and C.C. slept in the middle bedroom. *See id.* However, in the middle bedroom, there was a bunk bed with clothes on the top bunk, and C.C. later told Lolly that Child slept in the front room and he was the only one who slept in the middle room. *See id.* at 21. The front room had a full-size bed and two toddler beds. *See id.* Stepfather later admitted that Child slept in the front room with him. *See id.* at 22.

Lolly contacted Mother during the course of the investigation and interviewed her. *See id.* at 15. When the CPS report was first made, Mother agreed to stay in Stepfather's home with the children while Stepfather left. *See id.* at 17.

Mother was present while Child completed her forensic interview. *See id.* at 15. Mother examined the text messages and said that they were concerning, but she did not believe anything inappropriate was happening. *See id.* at 18. Lolly and Officer Green of the Philadelphia Police Department Special Victims' Unit advised Mother that it would be in the best interest of

her children to remain with her. *See id.* at 18. Mother agreed that Child and C.C. could not go back to Stepfather's home. *See id.* at 18. Lolly's investigation concluded with the children being in Mother's care. *See id.*

Alonzo Lyas testified that he has been a social work service manager for DHS for three years, and has worked in the sexual abuse unit for one year. *See id.* at 24. He stated that, on September 14, 2018, DHS received a CPS report regarding a past report as to all four children, where they were living, and the contact they were supposed to be having with Stepfather. *See id.* at 25.

In response, Lyas went to Stepfather's home, where he found no adults, and all four children. *See id.* The children appeared to be living in the home, and had all of their belongings in the home. *See id.* After being interviewed, the children explained that they lived at Stepfather's house. *See id.* at 25-26.

In an interview, Mother explained that due to the children's school location and their after school activities, it was more convenient for the family if the children lived with Stepfather. *See id.* at 27. To Lyas's knowledge, Mother was not living in the home. *See id.* at 26.

Mother acknowledged the past allegations against Stepfather to Lyas. *See id.* at 27. However, she claimed that the family was unaware of the appeals process and that Lolly had not explained the children were not supposed to be around Stepfather. *See id.* at 26-27. Lyas did not find this explanation credible, because the case history contained all correspondence

with the family, including a thorough explanation of the appeals process as well as the recommendations for contact restriction with Stepfather. *See id.* at 28.

Lyas explained this to Mother, who had no response. *See id.* at 28-29. Lyas testified that although Child repeatedly denied being abused, she did admit towards the end of 2018 that Stepfather had touched her buttocks in the home. *See id.* at 38.

At the May 23, 2019 hearing, the court adjudicated Child dependent and found that Mother had committed child abuse. The court did not specify under which section of the statute it made this finding. The order of adjudication, containing the finding of child abuse, states only that "[the court] finds child abuse as to mother." *See* Order, 5/23/19, at 2. Similarly, at the adjudicatory hearing, the court stated that "I'm going to make a finding of child abuse versus Mother based on the testimony at the hearing. And it's based on omission." N.T., 5/23/19, at 4.

Mother timely appealed and filed her statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On appeal, Mother raises the following issue for our review:

> 1. Whether the trial court erred in finding the evidence to have been sufficient in sustaining a finding of child abuse[?]

*See* Mother's Brief at 5.

We review a dependency court order for an abuse of discretion. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We accept the trial court's credibility

determinations and findings of fact so long as we find support for them in the record. **See id.** However, we need not accept the court's inferences or conclusions of law. **See id.**

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re M.G.**, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). The admission of evidence is within the purview of the trial court's discretion. **See In re C.M.T.**, 861 A.2d 348, 355 (Pa. Super. 2004).

> While dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S.[A.] §§ 6301–6375, the [CPSL] controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence. As the Supreme Court explained … "[as] part of [a] dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL.

**In The Interest of T.G.**, 208 A.3d 487, 490 (Pa. Super. 2019) (citations omitted).

To justify a finding of child abuse under section 6303(b.1) of the CPSL, a court must determine, among other possibilities, that clear and convincing evidence supports a finding that a child was sexually abused, or put at risk of such abuse, through any failure to act. **See In the Interest of N.B.-A.**, --- A.3d. ---, 2020 WL 354978, at *6 (Pa. 2020, filed January 22, 2020). "Sexual abuse or exploitation" is defined as "[t]he employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another

individual to engage in sexually explicit conduct, which includes ... [a]ctual or simulated sexual activity or nudity for the purpose of sexual stimulation or gratification of any individual."  23 Pa.C.S.A. § 6303(a); **see also Interest of I.R.-R.**, 208 A.3d 514, 520 (Pa. Super. 2019). To meet this standard, the evidence must be "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the facts in issue." **See N.B.-A.**, at *6.

While a finding that a child has been abused requires clear and convincing evidence to support it, the identity of the abuser need only be established by *prima facie* evidence. **See id.** In satisfying the necessary mental state of an accused abuser, the CPSL provides that the same definitions used in the Criminal Code apply in the CPSL. **See id.**

Mother argues that the basis for the child abuse finding "would be confined to the sexually explicit text messages exclusively."  Mother's Brief at 13.  Mother contends that there was no evidence presented of Mother having been aware of the messages prior to the investigation, and, thus, could not be culpable of child abuse.  **See id.**  Mother states that she "had not challenged the [dependency], in conceding [Mother] having subsequently allowed Child contact with [Stepfather]; but to re-emphasize, it would remain submitted that [Mother] had not participated in any Child Abuse . . . ."  **See id.** at 13-14.

Mother's argument is a mischaracterization of the trial court's analysis and reasoning for making an abuse finding and is simply not supported by the

evidence introduced at the hearing. Rather than finding that the abuse was based upon the text messages exclusively, the trial court appropriately considered the entire history of the case when deciding that Mother's inactions had led to either abuse or the likelihood that abuse would occur. The text messages were the indication of Stepfather's abuse, but Mother's actions in returning the children to Stepfather's care, despite the safety plan that had been explained to her, constituted the finding of abuse through Mother's inactions.

The trial court observed that Lolly had concluded that Stepfather had abused Child based upon the text messages and Child's siblings stating that Stepfather and Child shared a bed. *See* Trial Court Opinion, 8/20/19, at 4-5. Lolly testified that Mother agreed to take care of the children and not allow Child to see Stepfather; that Mother was made aware of the text messages, but did not appear to appreciate the degree of inappropriateness therein; and that Mother returned the children to Stepfather's care despite her agreement to not allow Child see Stepfather. *See id.*

Additionally, the trial court credited Lyas's testimony that he re-interviewed the children after the initial DHS report, and the children stated that they continued to live with Stepfather. *See id.* Again, rather than appreciating the seriousness of the danger Child could be in, Mother attempted to claim that she did not know the children were not supposed to be living with Stepfather. *See id.* The trial court concluded that "Mother's actions

under these circumstances were tantamount to interference with a child abuse investigation as well as an act of omission equivalent to child abuse." ***See id.***

Prior to our own analysis of Mother's arguments and the evidence, we note again the Pennsylvania Supreme Court's recent decision in ***N.B.-A.***, which reversed this Court's affirmance of the trial court's finding that Mother had committed child abuse by omission. ***N.B.-A.***, --- A.3d --- at * 8-12.

In ***N.B.-A.***, Mother took her six-year-old child to the emergency department at the Children's Hospital of Philadelphia ("CHOP") on November 17, 2016, after the child had been experiencing vaginal discharge for three days. ***See id.*** at * 1-3. Mother indicated that she had no concerns the child had been sexually abused and denied that any males were living in the home. ***See id.***

The child was discharged that same morning with instructions to take baths and maintain good hygiene. ***See id.*** The next day, lab tests of vaginal swabs revealed that the child had chlamydia. ***See id.*** At the request of CHOP staff, Mother brought the child back to the hospital for a physical examination and additional testing. ***See id.***

Although both Mother and the child denied any sexual abuse, CHOP staff filed a CPS report with DHS later that day. ***See id.*** The report indicated that, although Mother denied that any males lived in the home, the child reported that she lived with Mother, Grandmother, and three male "uncles," who were her stepfather and two stepbrothers. ***See id.*** Mother was evasive about the identity of the men and claimed they had moved out of the house a month

earlier. *See id.* The child was again discharged on November 19, 2016, and, pursuant to a safety plan, went to stay with Mother's aunt. *See id.*

DHS investigators interviewed Mother on November 21, 2016, and informed her an investigation had been opened; Mother did not appear concerned. *See id.* Mother admitted to living with her husband and two stepsons, but insisted she was unaware as to how the child could have contracted chlamydia, suggesting that the child may have contracted it at birth. *See id.* The child, when interviewed, continued to deny being abused. *See id.* Mother tested positive for chlamydia that same day; one of the stepsons tested positive for chlamydia on November 23, 2016, and fled the hospital for the Dominican Republic. *See id.* DHS obtained an order for protective custody for the child on November 22, 2016, and she was placed in foster care. *See id.*

The child was adjudicated dependent on December 5, 2016; one month later, Stepbrother was identified as the perpetrator of sexual abuse against the child. *See id.* At the conclusion of a March 16, 2018 hearing, the trial court found that Mother was the perpetrator of child abuse pursuant to 23 Pa.C.S.A. § 6303(b.1)(4) and (b), and that aggravated circumstances existed. *See id.* On appeal, this Court affirmed the finding of child abuse but reversed the finding of aggravated circumstances. *See Interest of N.B.-A.*, 209 A.2d 1072 (Pa. Super. 2019) (unpublished memorandum).

On appeal, however, the Pennsylvania Supreme Court disagreed. The Court noted that there was no evidence that the child exhibited, prior to her

initial hospital visit, any injury to put Mother on notice that the child had been abused. **N.B.-A.**, --- A.3d -- at *8-12. The Supreme Court noted the child was initially discharged without any suspicion of abuse and that there was no evidence Mother was aware, prior to November 17, 2016, that the child had a sexually transmitted disease or had been abused. **See id.** The court further observed there was no evidence that the child had told anyone she was sexually abused and, indeed, the child denied any abuse until she was placed in foster care. **See id.** Additionally, there was no evidence introduced to indicate that Mother knew or should have known that Stepbrother posed a risk to the child. **See id.** Although the Court was troubled by Mother's false statements, the false statements in and of themselves were insufficient to establish that Mother knew or should have known of a danger posed to the child by Stepbrother or disregarded warning signs of potential abuse and that she consciously and unjustifiably disregarded any risk. **See id.**

The instant case is distinguishable. Unlike the mother in **N.B.-A.**, the evidence is clear that Mother was aware that Stepfather posed a risk to Child. The testimony of both Lolly and Lyas reflected that, after the April 2018 CPS report, Mother was informed of the text messages that Stepfather had sent to Child. These text messages included Stepfather's request that he and Child "have some fun," and Stepfather's statements that "we can do it in the kitchen," "I am going to touch that butt," and "I'm coming to get some tonight." Similarly, Mother was aware that Stepfather and Child were sleeping in the same bed.

Between the text messages and the knowledge of the sleeping arrangements between her fourteen-year-old daughter and adult husband, Mother was aware that a risk was posed to Child if she was returned to Stepfather's care. Additionally, unlike the mother in **N.B.-A.**, Mother consciously disregarded that risk by returning the children to Stepfather's care. While Mother claimed that she was not aware she was not supposed to do this, the testimony of Lolly and Lyas was sufficient to allow the court to conclude otherwise. The trial court did not find Mother's claims credible, as was its purview. **See** Trial Court Opinion, 8/20/19, at 4-5.

In **N.B.-A.**, the time between Mother's knowledge of the alleged abuse and the child's removal from the home was very short. Within a matter of days, the child was brought to the hospital, diagnosed with chlamydia, interviewed by investigators, and removed from Mother's care. **N.B.-A.**, --- A.3d -- at * 1-3. In the instant case, Mother learned of the abuse in April 2018 and, at that time, agreed to a safety plan which involved no contact between the children and Stepfather. At some time between April and the September 14, 2018, when the second CPS report was generated, Mother disregarded the safety plan and returned the children to Stepfather.

By returning Child to Stepfather's care, after being aware of the text messages and the fact that Child was likely in an inappropriate relationship with Stepfather, Mother was aware that the conduct would likely continue. Similarly, the return of Child to Stepfather's care showed the conscious disregard of a substantial risk that the abuse would continue. The court's

conclusion that a reasonable person would not return a fourteen-year-old child to the care of an adult who slept in the same bed with her and sent text messages admitting to abusing her is not an error of law or an abuse of discretion.

By returning Child to Stepfather's care, Mother created a reasonable likelihood that the sexual abuse would continue. And, indeed, based upon Stepfather's guilty plea, the abuse occurred again once Child was returned to his care. **See** 23 Pa.C.S.A. § 6303(b.1)(4) and (6).[4]

Accordingly, the court did not abuse its discretion in concluding that DHS had introduced clear and convincing evidence sufficient to find that Mother had committed child abuse as to Child. **See R.J.T.**, 9 A.3d at 1190.

Order affirmed.

---

[4] Mother does not address the 23 Pa.C.S.A. § 6381(d) provision that evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or any other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by that parent. Nevertheless, the court did not err in finding Mother guilty of child abuse by act or omission; there was evidence introduced that Mother knew or should have known that Child was being sexually abused. **Cf. N.B.-A.**, --- A.3d --- at * 11 (court erred in *sua sponte* applying the 23 Pa.C.S.A. § 6381(d) presumption where there was no evidence presented that Mother knew or should have known that Child was being abused).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/6/20</u>