J-S40016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.H.-R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1218 EDA 2023 |

Appeal from the Order Entered May 1, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000021-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: I.H.-R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1219 EDA 2023 |

Appeal from the Order Entered May 1, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000022-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: P.H.-R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1220 EDA 2023 |

Appeal from the Order Entered May 1, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000023-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: J.R.-R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S40016-23

Appeal from the Order Entered May 1, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-DP-0000024-2023

BEFORE:   NICHOLS, J., SULLIVAN, J., and COLINS, J.*

MEMORANDUM BY SULLIVAN, J.:          **FILED DECEMBER 28, 2023**

N.R. ("Mother") appeals from the trial court's orders adjudicating her children—T.H.-R (born September 2010); I.H.-R (born February 2013); P.H.-R. (born May 2015); and J.R.-R. (born October 2008) (collectively, "the Children")—dependent, as well as the trial court's finding in T.H.-R.'s adjudication order that Mother is the perpetrator of child abuse pursuant to the Child Protective Services Law ("CPSL").[1]  We affirm.

The trial court set forth the following factual and procedural history:

> During the [a]djudicatory [h]earing on May 1, 2023, Mother's cousin, Na.R., testified that Mother, [Mother's] paramour (["]M.F.["]), and Mother's seven children, moved back to Philadelphia from Georgia[,] and that they were initially staying with [an] aunt.  The aunt's house was not large enough to accommodate all of them[,] so they moved out[,] and were living in Mother's car for a period of time.  Na.R. invited them all to move into her home with her, her paramour [("A.C."),] and [Na.R.'s] six children, after [Na.R.] learned that they were living in a car.

_____

* Retired Senior Judge assigned to the Superior Court.

[1] **See** 23 Pa.C.S.A. §§ 6301-6387.

- 2 -

Na.R. testified that M.F. told her that she was awakened by T.H.-R.'s crying in early November of 2022. [M.F.] found him on the couch and asked him what was wrong. He informed her that "[his brother, X.R.,] did something to [my] butt." Na.R., [A.C.], Mother, and M.F. all viewed video from cameras in the home to see whether X.R. had done anything to T.H.-R. [Na.R.] testified that the video they all watched showed X.R. anally raping T.H.- R while he slept. She stated that after they had viewed the video, Mother did not say anything, but rather gathered [the C]hildren and left the house. Na.R. testified that Mother sent T.H.-R. to school that day despite what he had endured. She added that, with one exception . . ., she has not seen Mother since that day. Na.R. also noted that Mother and M.F. never engaged in any discussions about taking T.H.-R. to the hospital[,] and that despite his crying, the situation seemed normal to him.

[Na.R.] also [testified] that after Mother, M.F., and the [C]hildren had left her home, there came a time in December [2022] when J.R.-R. ran [back to Na.R.'s home] and appeared at her door during the night. She noticed that J.R.-R. was crying and that his face was swollen. He reported that Mother's paramour, M.F., had beaten him up. Na.R. telephoned Mother and advised her that J.R.-R was outside her home and injured[,] and Mother told her not to open the door for him[, but] to call the police. Na.R. invited [J.R.-R.] in, and a short time later Mother and a male came and took him from the residence.

[Department of Human Services ("DHS")] Investigator Lakriesha Walker-Richards [("Walker-Richards")] testified regarding her involvement in this matter. She testified that she was charged with investigating a General Protective Services (GPS) Report dated January 9, 2023. The report alleged that Mother's paramour[, M.F.,] had physically assaulted J.R.-R. [] Walker-Richards interviewed J.R.-R. regarding these allegations[,] and J.R.-R. told her that his brother, X.R., sexually assaulted T.H.-R.[,] and that there was a video of the sexual assault that was circulating around the family. The investigation led [] Walker-Richards to speak to Na.R.[,] who confirmed that there was a video[,] and stated that she [] view[ed] the video with Mother. Na.R. was initially unable to locate the video[,] but later telephoned [] Walker-Richards to advise her that she had found it. [] Walker-Richards obtained the video from Na.R. and brought it to the Philadelphia Police Department's Special Victims Unit (["]SVU["]). [] Walker-Richards viewed the video at SVU[,] and

- 3 -

testified that the video depicted X.R. licking T.H.-R.'s anus and inserting his penis therein. Based on the contents of the video, [] Walker-Richards called in an Order of Protective Custody [("OPC")] to have the [C]hildren removed from the home.

[] Walker-Richards confronted Mother regarding the video and its contents[,] and Mother denied ever seeing the video or even of being aware of its existence. [] Walker-Richards also reviewed a General Protective Services report that was dated September 1, 2022[, that] was made to DHS regarding allegations that X.R. [had perpetrated] sexual abuse against some of Mother's other children in Georgia while the family was residing there. Mother [initially declined to inform Walker-Richards of the Georgia allegations, but later] told [] Walker-Richards that the case was closed[,] and that that was the reason the family returned to Philadelphia. Mother informed [] Walker-Richards that there was a safety plan in Georgia that included the stipulation that X.R. could not be around children. Mother also advised her that the allegations against X.R. were untrue and that he had not done anything to any children in Georgia. Mother added that none of the children were attending therapy but then the next day told [] Walker-Richards that they were in fact attending therapy[, which was confirmed.]

[] Walker-Richards testified that during a forensic interview, T.H.-R. initially acknowledged that an incident . . . occur[red] at Na.R.'s home[,] but that X.R. was not the perpetrator. During an interview with a detective from SVU, T.H.-R. stated that X.R. was in fact the perpetrator[,] and that he had initially denied it because he wanted to protect his brother.

[] Walker-Richards informed th[e] court that she had concerns regarding Mother's protective capacity. Her concerns were based on the allegations of physical abuse of the [C]hildren[,] and sexual abuse of T.H.-R. by X.R. She noted that during a visit to the home on January 9, 2023, she noticed that the [C]hildren were dirty, emitted a foul smell, and were generally unkempt. She also testified that her concerns included the fact that Mother did not initially acknowledge the investigation in Georgia or keep the safety plan in place that would have prohibited X.R. from having access to the other children. [] Walker-Richards noted that Mother was dishonest when she told her that the family returned to Philadelphia because the case regarding allegations of sexual abuse by X.R. was closed.

- 4 -

Specifically, a report from Georgia indicated that "a safety plan was put in place for child (X.R.) to be removed from the home while the investigation was in progress." The report also notes that the reason the Georgia investigation was closed was because the family "fled" to Philadelphia. The Georgia report indicated that P.H.-R, I.H.-R, and another child in the home who is not a party to this matter had all made disclosures of sexual abuse by X.R.

Mother also testified at the [adjudicatory] hearing . . .. She testified that she did not know anything about the video depicting [X.R.] rap[ing T.H.-R., and] that Na.R.'s claim that they watched [the video] together was untrue. She stated that . . . she took X.R. to a crisis center [in early November 2022] because "he wanted to kill his self because everybody keeps saying that he's doing stuff to people," and that it had nothing to do with the contents of the video because she was unaware of its existence.

Mother acknowledged signing a safety plan in Georgia regarding alleged sexual misconduct by X.R. Mother read portions of the contract she entered with Georgia authorities into the record at th[e adjudicatory] hearing. The contract stated that it "addressed multiple allegations of molestation" and "fondling" by X.R. She also recited from the document that it concerned attempted penetration by . . . X.R. towards I.H.-R., T.H.-R., and P.H.-R. The contract also noted that as a result of these allegations, X.R. was to be removed from the home immediately[,] and that he should be cared for by a responsible adult at a safe place.

Mother claimed that she continued the safety plan upon her return to Philadelphia. She noted that she initially sent X.R. to live with her brother[,] but her brother was not cleared by DHS[,] so X.R. returned to her at Na.R.'s home. Mother [testified] that she kept X.R. separated from the other children[,] and disputed the sleeping arrangements that were testified to by her, cousin, Na.R.[, *i.e.*, that the Children, except for P.H.-R., slept in the same room with X.R.]

Mother testified that J.R.-R. is hospitalized for mental health issues. She told this court that she believes he "needs to stay a little longer in Belmont[,] because he has not been on his mental health medication since January, since he had ran away." She also noted that prior to his hospitalization[,] he had "basically been running amok all-around Philadelphia." Mother seemed to

- 5 -

think that X.R. was the only problem[,] and testified that if the court system "could find somewhere for [X.R.] to go or [she] could find somewhere for [him] to go, [her] children could come home.

Trial Court Opinion, 8/18/23, at 3-7 (citations to the record omitted).

Following the May 1, 2023 adjudicatory hearing, the trial court adjudicated the Children dependent, and made a finding against Mother of abuse of T.H.-R. pursuant to 23 Pa.C.S.A. § 6303(b.1)(4). *See* N.T., 5/1/23, at 196; *see also*, *e.g.*, Order of Adjudication and Disposition, No. CP-51-DP-0000021-2023, 5/1/23. Both Mother and the trial court complied with Pa.R.A.P. 1925. Mother raises the following issues for our review:

1. Did the lower court err by making a finding of child abuse as to Mother[,] where "clear and convincing evidence" was not provided[] that Mother, either directly or by neglect[,] caused injuries to [T.H.-R.], as required by 23 Pa.C.S.A. § 6303?

2. Did the lower court err or abuse its discretion by making a finding of dependency as to Mother[,] as DHS failed to prove by "clear and convincing evidence" that the [C]hildren were dependent . . ., as required by 42 Pa.C.S.A. § 6302?

Mother's Brief at 6 (issues re-ordered for ease of disposition).

Our standard of review is as follows:

The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*Interest of A.C.*, 237 A.3d 553, 557 (Pa. Super. 2020) (internal citations omitted).

- 6 -

In her first issue, Mother challenges the sufficiency of the evidence for the trial court's finding that she was the perpetrator of abuse. This Court has explained that,

> [although] dependency proceedings are governed by the Juvenile Act[, **see** 42 Pa.C.S.A. §§ 6301-6475, the CPSL] controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence. . . . [T]he [Juvenile] Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL, and] reference must be made to the definition sections of both the [Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated.
>
> As part of [a] dependency adjudication, a court may find a parent [or caregiver] to be the perpetrator of child abuse[ ] as defined by the . . . CPSL. . . ..

**Interest of G.R.**, 282 A.3d 376, 380–81 (Pa. Super. 2022) (internal citations, quotations, and indentation omitted; some brackets in original).

The CPSL defines "child abuse," in relevant part, as "intentionally, knowingly or recklessly doing any of the following: . . . (4) Causing sexual abuse or exploitation of a child through any act or failure to act." 23 Pa.C.S.A. § 6303(b.1)(4).[2] "'Sexual abuse or exploitation' is . . . '[t]he employment, use . . . or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct, which includes . . . [a]ctual or simulated sexual activity or nudity for the purpose of sexual stimulation or gratification

---

[2] For the purposes of the CPSL, the terms "intentionally," "knowingly," and "recklessly" have the same meaning as set forth in 18 Pa.C.S.A. § 302. **See Interest of A.C.**, 237 A.3d at 558 (citing 23 Pa.C.S.A. § 6303(a)).

of any individual.'" ***Interest of S.C.***, 230 A.3d 446, 451 (Pa. Super. 2020) (quoting 23 Pa.C.S.A. § 6303(a); brackets in original). As noted above, the standard of proof for a finding of child abuse pursuant to section 6303(b.1)(4) is clear and convincing evidence, which is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." ***Interest of A.C.***, 237 A.3d at 558 (internal citation and quotations omitted). While a finding that a child has been abused requires clear and convincing evidence to support it, the identity of the abuser need only be established by *prima facie* evidence. ***Interest of S.C.***, 230 A.3d at 451.[3] Where a parent is aware that there is a risk of sexual abuse by a third party, yet permits the child and third party to sleep in the same area, the evidence is sufficient to establish recklessness, *i.e.*, the conscious disregard of the risk that sexual abuse will occur. ***See id***. at 453-54. Lastly, the trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. ***See Interest of S.C.***, 230 A.3d at 450.

---

[3] Pursuant to 23 Pa.C.S.A. § 6381(d), "evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or any other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by that parent." ***Interest of S.C.***, 230 A.3d at 453.

In her first issue, Mother argues there was "no evidence presented at trial that indicated that [she] failed to act and that this caused [T.H.-R.] to be abused." Mother's Brief at 16. Mother asserts that there was no testimony that she "routinely . . . left " T.H.-R. alone with X.R., but instead, the evidence showed she made efforts "to keep all her children safe." *Id*. Mother argues that whether she "saw a video after the fact does not prove that anything happened due to her failure to act." *Id*.

The trial court considered this issue and determined it is meritless:

> This court finds that Mother was well-aware of X.R.'s sexually predatory behavior against her own children from an incident that allegedly occurred in Georgia[,] from which she fled that jurisdiction and returned to Philadelphia. Mother's assertion that she kept X.R. separated from the other children lacks the ring of truth[,] as is evidenced by the video depicting X.R. anally raping T.H.-R. in the family home on Mother's watch. The likelihood of T.H.-R. suffering this horribly traumatic experience would have been significantly mitigated had Mother made reasonable efforts to protect all her children. The record is clear that Mother viewed the video of the incident with Na.R. and other family members and was therefore well-aware of its existence and horrifying contents. Mother's claim that she had no knowledge of the video and was not aware of it until it was brought to her attention by [] Walker-Richards lacks any modicum of credibility. These findings justified this court in finding child abuse by Mother for causing sexual abuse or exploitation of a child through any act or failure to act.

Trial Court Opinion, 8/18/23, at 10.

Following our review, we discern no abuse of discretion by the trial court. The evidence showed the following: Mother was aware in July 2022 of allegations by three of her children that X.R. had attempted to sexually penetrate them, and, as a consequence, she signed a safety plan, pursuant to

- 9 -

which she would remove X.R. from the address where the Children resided. *See* N.T., 5/1/23, at 63, 101-02. In September 2022, following the family's return to the Philadelphia area, Mother allowed the Children to move in with her cousin Na.R., two weeks before Mother moved in, during which time, Mother had no knowledge of the Children's sleeping arrangements. *See id*. at 112-13. Na.R. explained that the Children, apart from P.H.-R., all slept together in the same room, even after Mother moved in. *See id*. at 14. The assault occurred in November 2022 because Mother failed to make appropriate sleeping arrangements for the Children. Na.R., who watched the video of X.R.'s assault of T.H.-R., saw X.R. sleeping in the same room as T.H.-R., and then approach T.H.-R. during the night and anally rape him. *See id*. at 16, 18-20. We further note that Mother took no action to seek treatment for T.H.-R. or to refer the matter for criminal investigation; instead, as Na.R. testified, Mother "got her kids and left" after she viewed the video. *Id*. at 20; *see also id*. at 21-24.[4] Additionally, Mother initially lied to DHS investigator Walker-Richards about the allegations against X.R. in Georgia and, knowing that X.R. had anally raped T.H.-R. based on the video evidence, denied that any sexual abuse had occurred during a meeting with Walker-Richards in early

---

[4] DHS investigator Walker-Richards later provided the video to detectives in the Special Victims Unit for investigation, which led to a case against X.R. in the Philadelphia Juvenile Justice System. *See* N.T., 5/1/23, at 58, 88.

January 2023. *See id*. at 72, 76.[5] The evidence thus demonstrates Mother took no steps to protect the Children from X.R., and her failure to act caused T.H.-R.'s sexual abuse. *See Interest of S.C.*, 230 A.3d at 453-54. Mother's challenge to the sufficiency of the evidence for the trial court's finding of child abuse is meritless, and, therefore, due no relief.

In her second issue, Mother contests the trial court's order adjudicating the Children dependent. Before proceeding to the merits of Mother's issue, we must determine whether she has preserved it for our review. Issues not raised in the trial court are waived and cannot be raised for the first time on appeal. *See* Pa.R.A.P. 302(a).

Here, Mother conceded the issue of dependency. *See* N.T., 5/1/23, at 193 (Mother's counsel stating during closing, ". . . Your Honor, [I] honestly won't dispute that there's dependency here because [Mother] . . . is juggling a lot of balls, [and] she needs the services, she wants the services, she's been cooperative with the services"). Mother limited her argument to the finding of child abuse. *See id*. Accordingly, Mother has waived her challenge to the orders adjudicating the Children dependent, and she is due no relief. *See* Pa.R.A.P. 302.

---

[5] The trial court found incredible Mother's testimony in which she disputed, among other things, viewing the video; the record supports this determination, and we decline to disturb it. *See Interest of S.C.*, 230 A.3d at 450.

- 11 -

However, even if not waived, the trial court did not abuse its discretion. The trial court concluded that Mother failed to provide proper care and supervision for the Children. **See** Trial Court Opinion, 8/18/23, at 10; **see also** N.T., 5/1/23, at 196. The record supports this conclusion. The evidence shows that Mother—knowing several of the Children had alleged attempted sexual abuse by X.R. in Georgia—consciously disregarded the substantial risk that X.R. would later attempt to sexually abuse the Children by failing to make appropriate sleeping arrangements for the Children at Na.R.'s home, both before and after Mother moved in. Additionally, Mother did not investigate or seek treatment for T.H.-R. after witnessing evidence of X.R.'s abuse of T.H.-R., but instead left Na.R.'s home with the Children, and then denied the abuse had occurred until denial was no longer viable. There is no question there was clear and convincing evidence that Mother's conduct placed "the health, safety or welfare of the child at risk." **Interest of I.R.-R.**, 208 A.3d 514, 520 (Pa. Super. 2019); 42 Pa.C.S.A. § 6302; **see also In re M.W.**, 842 A.2d 425, 429 (Pa. Super. 2004) (holding that "it is within the trial court's discretion to determine that siblings of sexually abused children fit that [broader] definition [of dependency], even if there is no evidence that the siblings themselves will be sexually abused"). As neither of Mother's issues merit relief, we affirm the adjudication orders at all dockets, including the finding that Mother is the perpetrator of child abuse at No. CP-51-DP-0000021-2023.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/28/2023