J-S26016-24 & J-S26017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M.-C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 377 MDA 2024 |

Appeal from the Order Entered February 20, 2024
In the Court of Common Pleas of Adams County Juvenile Division at
No(s): CP-01-DP-0000059-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 413 MDA 2024 |

Appeal from the Order Entered February 20, 2024
In the Court of Common Pleas of Adams County Juvenile Division at
No(s): CP-01-DP-0000059-2022

BEFORE:  PANELLA, P.J.E., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY OLSON, J.:               **FILED: SEPTEMBER 24, 2024**

In these consolidated appeals, A.M.-C. ("Father") and K.F. ("Mother") (collectively, "Parents") appeal from the February 21, 2024 order finding that their biological daughter, A.M.F. ("Child"), born in April 2018, was the victim

of child abuse perpetrated by Parents.[1]  In rendering this finding, the trial court admitted Child's out-of-court statements pursuant to 42 Pa.C.S.A. § 5986 of the Juvenile Act.[2]  After careful review, we affirm.

We glean the factual and procedural history of this matter from the certified record.  Preliminarily, we gather that Parents are not married, do not cohabitate, and shared physical and legal custody of the Child under an existing custody order prior to the events of the instant controversy.  We also note Parents' shared custody of Child was largely characterized by competing recriminations of abuse and misdeeds.  *See* N.T., 10/10/23, at 141.

The Adams County Children and Youth Agency ("CYA" or "the Agency") first became involved with Parents' family on October 24, 2021, when it received a referral indicating that Father was abusing alcohol.  These allegations were not substantiated and the case was closed in December 2021.

In July 2022, the Agency received a Child Protective Services ("CPS") referral alleging that Child had been sexually abused by Mother's paramour, G.W., who then resided with Mother and Child.  This report resulted in Child undergoing a medical examination, which was conducted by forensic nurse Tracy Wallace.  *See* N.T., 10/10/23, at 315.  Thereafter, Child underwent a

---

[1]  We have consolidated these cases *sua sponte* pursuant to Pa.R.A.P. 513 ("Where there is more than one appeal from the same order, or where the same question is involved in two or more appeals in different cases, the appellate court may, in its discretion, order them to be argued together in all particulars as if but a single appeal.").  As discussed further *infra*, Parents' issues are identical and concern the same factual and procedural events.

[2]  *See* 42 Pa.C.S.A. §§ 6301-75.

second such examination in August 2022, which was conducted by forensic nurse Shannon Small.[3] *See id*. at 343-44. Ultimately, the July 2022 report was not substantiated. The Agency received a similar referral in October 2022, and Child underwent a forensic interview at the Adams County Children's Advocacy Center ("CAC"). This report was also not substantiated.

On December 5, 2022, the Agency received a referral alleging that Father had sexually abused Child after Mother reported finding noticeable bruising to Child's pubic area. These physical indications were confirmed after Child underwent an examination that was conducted by forensic nurse Morgan Powley.[4] Despite these allegations, Father obtained physical custody of Child on December 15, 2022, pursuant to the conditions of the existing custody order and with the assistance of law enforcement. On the same day:

> a [CPS] referral was received by the Agency alleging sexual abuse of Child by G.W. Additionally, Father filed a PFA petition seeking to prohibit contact between Mother and Child. Due to the ongoing CPS investigations against Father, Mother, and G.W., a family plan was entered into placing custody of Child in a kinship setting with a friend of Father's who was familiar with Child. The following day, the Agency discovered that Father's friend had returned custody of Child to Father. On December 19, 2022, an application for protective custody was filed by the Agency and emergency protective custody was subsequently granted by the court. Child was placed in a kinship placement with her maternal grandfather.

---

[3] The respective examinations performed by Ms. Wallace and Ms. Small revealed only that Child had some "redness" in her vaginal area, which was within normal limits. *See* N.T., 10/10/23, at 315-316, 343-344.

[4] Ms. Powley was previously known as "Morgan Reed" and is referred to by this moniker in the trial court's final order. *See* Order, 2/21/24, at 1.

Trial Court Opinion, 4/9/24, at 3 (cleaned up). On January 3, 2023, the court adjudicated Child dependent and provided that Mother would have supervised visits with Child at the Agency.[5] *See* Order of Adjudication, 1/5/23, at 2.

On January 9, 2023, the court modified Child's placement "amid concerns of undue influence" by Father's family and placed Child in foster care with A.F. and her husband, D.F. *Id*. Contemporaneously, Child began attending therapy at CAC with trauma therapist Amanda Evans-Freet. On January 11, 2023, Ms. Evans-Freet submitted a letter to the Agency sharing her concerns that Child's symptoms and behaviors suggested that she had "a history of being verbally coached by adult(s), inappropriate sexualized exposure(s) and a history of residing in an unsafe environment(s) with an unsafe adult(s)." Motion to Suspend Contact, 1/13/23, at Exhibit A.

Based upon these concerns, the Agency filed a motion to suspend contact between Child and Parents, which was denied on January 17, 2023. *See* Order, 1/17/23, at 1 (unpaginated). The court did, however, limit Child's interactions with Parents to "video conferencing with an interpreter present" and permitted the Agency to "digitally record" these interactions. *See id*.

On January 20, 2023, the Agency filed a second request to suspend contact between Child and Parents. The trial court held a hearing on January 27, 2023, wherein Ms. Evans-Freet testified concerning her two interviews

---

[5] At the time of the dependency adjudication, Father's exact entitlement to visitations is not clear from the certified record.

with Child and her observations and opinions regarding a recorded interaction between Parents and Child. At the conclusion of the hearing, the court stayed visitation until the next permanency review hearing. Ultimately, the trial court maintained the suspension of Parents' contact with Child.

On May 2, 2023, Child's foster placement was transferred to C.B. ("Foster Mother") and R.B. ("Foster Father") (collectively, "Foster Parents"), where Child remained for the remainder of these proceedings.

On June 29, 2023, the Agency filed a motion requesting a finding that Parents had abused Child, which included numerous allegations based upon out-of-court statements made by Child. On July 20, 2023, CYA submitted a companion petition to admit Child's out-of-court statements pursuant to Section 5986(a)(2)(ii) and (b), arguing that forcing Child to testify would result in serious emotional distress that would substantially impair her ability to reasonably communicate. 42 Pa.C.S.A. § 5986(b); *see also* Motion to Allow Testimony of Out-of-Court Statements, 7/20/23, at ¶¶ 13-19.

The trial court held joint hearings on the Agency's petitions on September 21, 2023, October 10, 2023, and January 30, 2024. Therein, the Agency elicited testimony from, *inter alia*, the individuals to whom Child had made relevant disclosures: Foster Parents, Ms. Powley, Ms. Evans-Freet, A.F., and CYA caseworkers Montana Sigel and Elizabeth Winebrenner. Father testified in his own behalf and adduced testimony from several witnesses,

including Ms. Wallace and Ms. Small. Mother did not testify, or introduce any supplemental evidence, in her defense.

On February 20, 2024, the trial court filed an order admitting Child's various out-of-court statements pursuant to Section 5986(a)(2)(ii) and (b). *See* Order of Court, 2/20/24, at ¶ 2. Furthermore, the trial court found that Child was a victim of child abuse perpetrated by Parents. *See id*. at ¶ 3.

On March 15, 2021, Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On March 21, 2024, Mother similarly timely filed both a notice of appeal and a concise statement.[6] Thereafter, the trial court filed responsive opinions pursuant to Rule 1925(a)(2)(ii).[7]

_____

[6] We note with concern that significant judicial resources were expended to ensure that Mother's counsel, Tracy Marie Sheffer, Esquire, adequately represented her client and responded to directives from this Court. Specifically, Attorney Sheffer was directed to file a docketing statement no later than April 9, 2024. Attorney Sheffer failed to do so and subsequently ignored two separate orders from this Court that *sua sponte* provided her additional time to comply. *See* Order, 6/7/24, at 1. Attorney Sheffer did not file a docketing statement until June 26, 2024. By that point, Attorney Sheffer had also filed a late brief on Mother's behalf and similarly failed to timely file paper copies of the same. *See* Order, 5/29/24, at 1. While it does not appear that Mother's appeal has been prejudiced by Attorney Sheffer's inaction, we emphasize that unexcused delays are unacceptable in the context of Children's Fast Track cases. *See In re T.S.M.*, 71 A.3d 251, 261 n.21 (Pa. 2013).

[7] The court filed a Rule 1925(a)(2)(ii) opinion with respect to Father's appeal on April 8, 2023, and a separate opinion with respect to Mother's appeal on April 9, 2023. We discern, however, that the writings are identical.

Although filed separately and by different counsel, the issues presented in Parents' respective briefs are identical. *Compare* Father's Brief at 6-7 *with* Mother's Brief at 6-7. Although Parents have each listed six issues in their respective statements of questions presented, their substantive argument advances just two claims for relief: (1) that the trial court erred in admitting Child's various out-of-court statements pursuant to the "tender years" exception at Section 5986;[8] and (2) that the trial court erred in finding that Parents had abused Child within the meaning of Section 6303(b)(1). *See* Father's Brief at 18, 41; Mother's Brief at 18, 38. We will address each

_____

[8] We note that there is some confusion in the record regarding the admission of Child's out-of-court statements. As noted above, the Agency requested that the statements be admitted pursuant to Section 5986. In its February 20, 2024 order granting that request, the trial court again referenced Section 5986. *See* Order of Court, 2/20/24, at ¶ 2. For the first time, however, the trial court's Rule 1925(a)(2)(ii) opinion referenced 42 Pa.C.S.A. § 5985.1 as the basis for that portion of its holding. Parents have similarly discussed only the applicability of Section 5985.1 in their respective briefs. Although separately enshrined in statute, a close reading reveals that the relevant portions of these statutes are quite similar. *Compare* 42 Pa.C.S.A. § 5985.1(a)(1), (a.1) *with* 42 Pa.C.S.A. § 5986(a)-(b). The critical distinction between these two statutes with respect to the admission of evidence is that Section 5985.1 applies broadly to "any criminal or civil proceeding," while Section 5986 applies only to "dependency proceedings." *Id*.

To the extent the trial court and litigants refer to Section 5985.1, such discussions appear misplaced. *See Interest of J.J.*, 283 A.3d 369, 2022 WL 2764373 at *3 n.4 (Pa. Super. 2022). We also note, however, that the appellate courts of the Commonwealth have discussed these statutes interchangeably. *See Fidler v. Cunningham-Small*, 871 A.2d 231, 235 n.2 (Pa. Super. 2005). In any case, given that the relevant statutory language is identical, any arguable error is largely clerical in nature. Nevertheless, we urge all parties to exercise caution when framing their statutory analyses.

contention, in turn, beginning with the admission of Child's statements under Section 5986.

As a general matter, our standard of review with respect to the admission of evidence is "deferential." ***Commonwealth v. Stevens***, 2024 PA Super 175, \_\_\_ A.3d \_\_\_, at *3 (Pa. Super. 2024). More specifically, we review such rulings under an abuse of discretion standard:

> Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and its discretion will not be reversed absent a clear abuse of discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Thompson***, 106 A.3d 742, 754 (Pa. Super. 2014). As Our Supreme Court has aptly stated: "[A]n appellate court should not find that a trial court abused its discretion merely because the appellate court disagrees with the trial court's conclusion." ***Commonwealth v. Talley***, 265 A.3d 485, 530 (Pa. 2021). These precepts apply equally in dependency proceedings.[9] ***See Interest of S.C.***, 230 A.3d 446, 450 (Pa. Super. 2020) (citing ***In re C.M.T.***, 861 A.2d 348, 355 (Pa. Super. 2004)).

---

[9] This Court has explained that, "[w]hile dependency proceedings are governed by the Juvenile Act . . ., the [Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §§ 6301-88,] controls determinations regarding findings of child abuse[.]" ***S.C.***, ***supra*** at 450. Accordingly, it is well-established that, "as part of a dependency adjudication, a court may find a parent to be the perpetrator of child abuse, as defined by the CPSL." ***Id***.

Parents' collective challenge to the admission of this evidence implicates Pennsylvania law regarding "hearsay," which is generally prohibited from admission in legal proceedings. *See* Pa.R.E. 802. There are, however, a number of exceptions to the prohibition against hearsay that exist in our Rules of Evidence, the case law of our Supreme Court, and, most importantly for the matter *sub judice*, our statutes. *Id*.

Instantly, Section 5986 codifies this Commonwealth's tender-years exception to Rule 802. *See Commonwealth v. Frost*, 304 A.3d 789, 2023 WL 5607645, at *25 (Pa. Super. 2023). Specifically, "'[t]he tender-years exception allows for the admission of a child's out-of-court statement due to the fragile nature of young victims of sexual abuse.'" *Id*. (quoting *Commonwealth v. Fink*, 791 A.2d 1235, 1248 (Pa. Super. 2002)). While our case law acknowledges that this "special accommodation" poses "unique challenges" by circumscribing a defendant's constitutional right to confrontation, this Court has explained that "[a] child may not be able to tell [their] story in court because of emotional trauma associated with the crime." *Id*. Thus, the individuals who have heard the victim's disclosures essentially become their "surrogate in court." *Id*.

In pertinent part, Section 5986 provides, as follows:

**(a) General rule.**—A statement made by a child describing acts and attempted acts of indecent contact, sexual intercourse or deviate sexual intercourse performed with or on the child by another, not otherwise admissible by statute or court ruling, is admissible in evidence in a dependency proceeding initiated under

Chapter 63 (relating to juvenile matters), involving that child or other members of that child's family, if:

(1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is found by the court to be unavailable as a witness.

**(b) Emotional distress.--**In order to make a finding under subsection (a)(2)(ii) that the child is unavailable as a witness, the court must determine, based on evidence presented to it, that testimony by the child as a witness will result in the child suffering serious emotional distress that would substantially impair the child's ability to reasonably communicate. In making this determination, the court may do all of the following:

(1) Observe and question the child, either inside or outside the courtroom.

(2) Hear testimony of a parent or custodian or any other person, such as a person who has dealt with the child in a medical or therapeutic setting.

42 Pa.C.S.A. § 5986(a)-(b). This statute essentially sets forth a tripartite test that must be satisfied in order to permit admission, namely: (1) the at-issue statements must be "relevant;" (2) the "time, content and circumstances of the statement" must "provide sufficient indicia of reliability;" and (3) the child-declarant must, *inter alia*, be considered "unavailable." *Id*.

Initially, we note that Parents have not advanced any cognizable challenge to the trial court's conclusion that Child's statements were relevant.

*See* Mother's Brief at 14-38; Father's Brief at 18-41. Rather, Parents have focused their arguments upon the second and third prongs of Section 5986, *i.e.*, reliability and unavailability. We will address each such finding, beginning with the reliability of Child's out-of-court statements.

In particular, we take significant guidance from our Supreme Court's discussion of "reliability" in this context:

> [I]n determining whether out-of-court statements of a child contain particularized guarantees of trustworthiness surrounding the circumstances under which the statements were uttered to the person who is testifying, and, therefore, are admissible under the [tender years' exception], the focus is on the truthfulness of the statements, which is assessed by considering the spontaneity of the statements; the consistency in repetition; the mental state of the child; the use of terms unexpected in children of that age; and the lack of a motive to fabricate.

***Commonwealth v. Walter***, 93 A.3d 442, 452-53 (Pa. 2014). We also remain mindful of the overarching purpose of the at-issue legislative subchapter:

> In order to promote the best interests of the residents of this Commonwealth who are under 18 years of age, especially those who are material witnesses to or victims of crimes, the General Assembly declares its intent, in this subchapter, to provide, where necessity is shown, procedures which will protect them during their involvement with the criminal justice system.

42 Pa.C.S.A. § 5981.

With respect to reliability, the trial court articulated its reasoning in admitting Child's out-of-court statements, as follows:

> [A] review of the current record reflects not only the use of graphic sexual terminology and descriptions unexpected of a child of five years of age but also sexualized behavior by [Child] well beyond the normal range of behavior of a child of similar age. All statements made by [Child] were spontaneous in nature and

- 11 -

lacking any prompting by interrogation or undue influence. The statements are consistent in subject matter and, importantly, were uttered to separate adults in separate settings. There is no indication of motive to fabricate or manipulate the situation on the part of [Child]. Perhaps most persuasive is the consistent testimony of the statement recipients that [Child's] representations were accompanied by psychosomatic physical manifestations including uncontrollable dissociation.

Trial Court Opinion, 4/9/24, at 11. The trial court specifically credited the testimony of Ms. Evans-Freet, who appeared as an expert in the field of child trauma and play therapy. *See id*. at 10, 13; *see also* N.T., 9/21/23, at 6.

Parents argue that the trial court's conclusion that Child's various statements are reliable is not supported by the evidence of record. *See* Mother's Brief at 23 ("Contrary to the [c]ourt's assertion, the evidence presented during the three-day finding of abuse hearing reveals that [C]hild's out-of-court statements do not bear sufficient indicia of reliability to be admissible in evidence."); Father's Brief at 25 (same). We must disagree.

Contrary to Parents' arguments, our review reveals overwhelming support for the trial court's finding that Child's statements were sufficiently reliable to permit their admission pursuant to Section 5986. In particular, Child made a significant number of disclosures to Ms. Evans-Freet during the course of Child's trauma therapy sessions. Of particular note, Ms. Evans-Freet explained that Child's disclosures of abuse were often accompanied by periods of acute "dissociation," which she defined and explained as follows:

Disassociation is when something is emotionally too overwhelming for an individual and they actually fracture and leave mentally from where they are going to like another place, another time.

- 12 -

> Very often in children it looks like they are spacing out or zoning out and they are typically unresponsive to initial verbal prompts to get them to communicate with you.

N.T., 9/21/23, at 8.

During a therapy session on February 1, 2021, Child told Ms. Evans-Freet that "strangers come into my bedroom and put things in my butt" at Father's house.[10] *Id*. at 9. Ms. Evans-Freet testified that Child immediately "disassociated after speaking about the strangers that come to the house[.]" *Id*. at 10. Ms. Evans-Freet averred that Child made similar statements on March 7 and March 8, 2023, which she described as follows:

> [Child] stated I got married once. When you get married you have to get naked and the person you married is allowed to touch you. She stated strangers put things in my butt. That really hurt. . . . She stated I rub their bellies to make them happy. They said it makes them feel better and their snakes happy. She stated strangers stick things in my butt.

*Id*. at 10. Ms. Evans-Freet testified that Child also "identified snakes as male genitalia." *Id*. at 11. Again, Ms. Evans-Freet reported that Child began to dissociate immediately after making these statements. *Id*. at 11-12.

Ms. Evans-Freet detailed another, troubling disclosure that occurred during a session on March 21, 2023, wherein Child stated the following:

> [S]trangers stick things in my butt and show me how to stick things in their butt. [G.W.] and Mommy go with me to strangers' houses. I go into a room and strangers come and knock on my door all day. [Mother] is in a different room. The strangers stick things up [Mother's] butt too. They say not be scared because

---

[10] Ms. Evans-Freet explained that Child "called her butt both the backside of her bottom as well as her vaginal area." N.T., 9/21/23, at 12.

they will never leave me. [Mother] doesn't like the strangers. She cries.

*Id*. at 14. On June 13, 2023, Child made additional statements to Ms. Evans-Freet regarding Father, as follows: "She stated [Father] is mean. Strangers are there. She stated strangers are in a room where they put things in my butt. She stated strangers have penises." *Id*. at 20. Ms. Evans-Freet testified that Child was "very fearful" and dissociated, twice, during this session. *Id*.

Ms. Evans-Freet testified further that, during a session on August 22, 2023, Child stated that the "strangers" would come to the homes of both Parents. *Id*. at 26 ("She stated the strangers come to both houses. [G.W.'s] and [Father's] house."). Child also clarified that the strangers she was referring to were "the ones that stick things up her butt." *Id*. at 27.

On September 20, 2023, while Ms. Evans-Freet was reading a book to Child, the following exchange took place between them:

> There's a part of the story where there are two girls in the one girl's bedroom and they're playing dress-up and they hear somebody walking up the steps and see the doorknob turning and in the story the girls say, oh, no, the pixies are here and [Child] blurted out, it's like the strangers and moved her hand up my thigh to my genital area, which I redirected her. She then stared at me and put – and tried to put her head in my lap with her mouth open towards my crotch, which I had to then physically intervene and put both my hands on her shoulders and physically move her away from me to not engage in that sexualized re-enaction.

*Id*. at 34-35. Once more, Ms. Evans-Freet also reported that Child dissociated multiple times during this particular session. *See id*. at 35-36.

With striking similarity, A.F. testified that Child was often in fear of "strangers" and would constantly ask about them. *See id*. at 188 ("She often asked about strangers everywhere we went. She asked about strangers at the store, at church, at our home, at daycare. Particularly men."). More specifically, A.F. testified as follows regarding statements made by Child on March 14, 2023: "[S]he said my family scares me, they hurt my heart, they send me to strangers, they send me to the strangers, they touch my privates and they stick it in me, and it hurts so bad, and she was crying hysterically[.]" *Id*. at 194. Like Ms. Evans-Freet, A.F. reported that Child would regularly dissociate. *See id*. at 194-95 ("She would stare off. We would try to get her to – we would say her name, and she wouldn't respond. . . . [S]ometimes it [would] last a minute, sometimes a couple of seconds, sometimes longer.").

Child's respective statements to Foster Parents also closely dovetailed with these disclosures. On May 23, 2023, Foster Father was taking Child to her therapist appointment, when she spontaneously stated "that strangers hurt her[.]" *Id*. at 210. ("[S]he said . . . they knock on the door like this, and she knocked on the side of the car, and then they come in and hurt me and [Mother]."). Foster Father also testified that, on another occasion, Child commented that "strangers poke her private parts" when she stays at Father's home. *Id*. at 211-12. Relatedly, Foster Father also testified regarding Child's tendency to dissociate. *See id*. at 210 ("[S]ometimes when she gives statements, or thoughts, she will zone out[.]").

Child's revelations to Foster Mother were even more troubling. On May 18, 2023, Foster Mother was taking Child to a doctor's appointment to address Child's complaints about vaginal pain. During the car ride, Child stated that "the strangers poked my privates and that's why it hurts." *Id*. at 232. Then, on May 24, 2023, Foster Mother was getting Child ready for bed when she averred that "strangers" had stuck their "penises" into Child's "privates" at Mother's "house." *Id*. at 234. Afterwards, Foster Mother testified that Child began making "sexualized motions" on the floor in an attempt to re-enact what "the strangers" had done to her. *Id*. Foster Mother also testified that, on September 14, 2023, Child claimed that Father, Mother, and G.W. were all responsible for taking her "to the strangers." *Id*. at 247. Foster Mother also confirmed that Child dissociates on a daily basis, particularly when she is speaking about sexual matters. *See id*. at 226-27. During these episodes, Foster Mother reported that Child would lose control of her "motor functions" and that it was "hard to get her to kind of come back to reality." *Id*. at 227.

Turning to the CYA caseworkers, Ms. Winebrenner testified that, on April 3, 2023, she was visiting Child's daycare when Child approached her and "mentioned that strangers were knocking at [Mother's] door and they don't stop knocking[.]" *Id*. at 287. Ms. Sigel also testified that she was transporting Child to therapy on a different, unspecified day when Child spontaneously whispered "strangers hurt me and they are bad guys." *Id*. at 218.

Finally, Ms. Powley testified regarding Child's hospital visit on December 6, 2022, to address a "bruise" near her genitals. *See* N.T., 10/10/23, at 159. Ms. Powley described Child's disclosure during this exam, as follows:

> [W]hen I asked her about the bruise . . . she said Papa poked me with a stick, and . . . I asked her to clarify who Papa was, and she stated it was [Father]. When I asked [Child] to clarify where [Father] poked her, she pointed to her genital area and she stated he poked me and it hurt.
>
> [T]hen I asked [Child] what kind of stick [Father] poked her with, and she stated his stick down there on him. I asked her to clarify where [Father's] stick is located, and she pointed again to her genital area.

*Id*. at 161.

Viewed together, we find that the testimony set forth above definitively speaks for itself. The details of Child's above-described statements and actions bear all of the indicia of reliability demarcated by our Supreme Court. *See Walter*, 93 A.3d at 452-53. The testimony of each disclosure witness indicates that Child's statements were spontaneous and remarkably consistent, even in spite of Child's ongoing issues with dissociative episodes. Furthermore, Child's sexualized behavior and language is quite telling. Indeed, Ms. Evans-Freet opined that Child's level of sexual knowledge was "[a]bsolutely not" normal given her age. *See id*. at 45 ("[T]he only time that I see a child of this age with this amount of knowledge is when they've had repeated exposure to sexualized encounters[.]").

Furthermore, given the level of detail in Child's statements, Ms. Evans-Freet also testified that she did not believe that Child was being

dishonest. *See* N.T., 10/10/23, at 149 ("[M]ost five-year-olds don't know how to play out sexualized behaviors."). Ms. Winebrenner also emphasized that Child's case was extraordinary due to "[t]he amount of detail that was provided, the consistency that was provided from [Child], and the concern for the amount of statements that she has made on a regular, consistent basis." *Id*. at 286.

Based upon the foregoing, we observe no abuse of discretion in the trial court's determination that Child's statements were sufficiently "reliable" for the purposes of admitting them pursuant to Section 5986. Stated succinctly, Child's statements carry all of the commonly recognized elements of reliability.

We also must assess whether Child was "unavailable" within the meaning of Section 5986(b). *See* 42 Pa.C.S.A. § 5986(b) ("[T]he court must determine, based on evidence presented to it, that testimony by the child as a witness will result in the child suffering serious emotional distress that would substantially impair the child's ability to reasonably communicate.").

The trial court summarized its findings on unavailability, as follows:

> At the hearings, the [c]ourt heard, and accepted as credible, the opinion of [Child's] trauma therapist, Ms. Evans-Freet, who opined that requiring [Child] to testify as a witness would result in her suffering serious emotional distress. This finding was corroborated by the testimony of the separate foster parents who, along with Ms. Evans-Freet, described [Child's] digression into a dissociative state when speaking about [Parents] and "the strangers."

Trial Court Opinion, 4/9/23, at 10.

With respect to unavailability, Parents argue that the trial court did not have a sufficient evidentiary basis to conclude that Child would suffer serious emotional distress that would substantially impair her ability to reasonably communicate. **See** Father's Brief at 19 ("Contrary to [the court's] assertion, [Child] was not statutorily 'unavailable' as a witness pursuant to the [t]ender [y]ears statute and should have been made to testify at the hearing."); Mother's Brief at 18 (same). We disagree.

In her capacity as an expert in the field of child trauma, Ms. Evans-Freet testified succinctly regarding her well-founded belief that forcing Child to recount these events in open court would cause her significant emotional turmoil and impede her ability to testify, as follows:

> I have documented that she's disassociated in at least 20 of our 44 sessions with some of those sessions multiple times and we're just talking momentarily, briefly, these statements about the strangers or about her family, I don't think the child is capable of answering questions regarding this nature, the nature of this content. I would be very fearful that she would disassociate on the stand and be unable to communicate effectively.

N.T., 9/21/23, at 40. Additionally, Ms. Evans-Freet emphasized that these dissociative episodes constituted a serious risk to Child's development, mental capacity, and ability to communicate. **See id**. at 41-42 ("[I]t will impede her ability to retain any new information including inhibiting her from gaining academics in school or learning new skills at home or really being able to process more of this trauma[.]"). Ms. Evans-Freet further averred that Child was even at risk of developing a dissociative identity disorder. **See** N.T.,

9/21/23, at 41. In addition to Ms. Evans Freet's extensive descriptions of Child's episodes of dissociation, the respective testimonies of A.F. and Foster Parents corroborate and highlight the frequency and seriousness of Child's dissociative behavior. *See* N.T., 10/10/23, at 194-95, 210, 226-27.

Viewing this evidence collectively, we observe no abuse of discretion in the trial court's holding that Child was "unavailable" to testify due to "emotional distress" pursuant to Section 5986. *See* 23 Pa.C.S.A. § 5986(b).

Based upon the foregoing analysis, we find no abuse of discretion or error of law in the trial court's admission of Child's numerous out-of-court statements pursuant to Section 5986. No relief is merited on this point.

We now turn to Parents' arguments concerning the findings of abuse rendered by the trial court. As above, we review the orders of a dependency court concerning child abuse for an abuse of discretion. *S.C.*, 230 A.3d. at 450. We emphasize that "[t]he trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *Id*. Moreover, this Court is bound to "accept the trial court's credibility determinations and findings of fact so long as we find support for them in the record." *Id*.

The trial court rendered its finding that Parents had perpetrated child abuse pursuant to 23 Pa.C.S.A. § 6303(b.1) of the CPSL. Specifically, the trial court explained that Parents' actions fell within the meaning of Section

6303(b.1)(4).[11]  **See** Trial Court Opinion, 4/9/24, at 12.  This particular subsection defines "child abuse" to include "[c]ausing sexual abuse or exploitation of a child through any act or failure to act."  23 Pa.C.S.A. § 6303(b.1)(4).  This Court has discussed this inquiry, as follows:

> To justify a finding of child abuse under [S]ection 6303(b.1) of the CPSL, a court must determine, among other possibilities, [that] clear and convincing evidence supports a finding that a child was sexually abused, or put at risk of such abuse, through any [act or] failure to act.  "Sexual abuse or exploitation" is defined as "the employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct, which includes . . . actual or simulated sexual activity or nudity for the purpose of sexual stimulation or gratification of any individual."  23 Pa.C.S.A. § 6303(a) . . . .  To meet this standard, the evidence must be so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the facts in issue.

**S.C.**, 230 A.3d at 450-51 (some internal citations omitted).  We also note that, "[w]hile a finding that a child has been abused requires clear and convincing evidence to support it, the identity of the abuser need only be established by *prima facie* evidence."  **Id**. at 451.

> The trial court explained its reasoning, as follows:

> The evidence presented by the Agency following extensive hearing is not only sufficient to establish child abuse but also establishes the identity of the perpetrators by clear and convincing evidence.

---

[11]  On the first page of its Rule 1925(a)(2)(ii) opinion, the trial court references 23 Pa.C.S.A. 6303(b.1)(1).  **See** Trial Court Opinion, 4/9/24, at 1.  Given the trial court's substantive discussion of Section 6303(b.1)(4), we discern that this is an inadvertent typo.  **See id**. at 12.  There are no other indications that the trial court may have based its ruling upon Section 6303(b.1)(1).

> Over the course of several months, [Child] expressed fear of [Parents] and consistent accounts of "strangers" putting "sticks" in her "butt" while in the custody of both [Parents]. While under initial inspection one might question statements made by a five-year-old as fantasy, the statements gain significant credibility by their consistency, interrelationship, and the obvious trauma displayed by [Child]. As mentioned above, the statements were unprompted in various scenarios to at least [six] separate individuals. Moreover, the complexity of the interrelationship between the statements is much greater than one would expect from a five-year-old. . . . Moreover, [Child] did not simply recite allegations during the disclosures but exhibited extreme psychosomatic reactions, including significant dissociative behavior witnessed, once again, by several independent witnesses. It is unreasonable to suggest that a five-year-old is sufficiently skilled enough to "act" in such a convincing manner consistent with the "claims" unless, of course, the child is not "acting." [Child's] statements are further corroborated by the testimony of Ms. Evans-Freet who credibly testified, based on her experience, that [Child] has been subjected to significant coaching and child abuse. The totality of this evidence establishes by clear and convincing evidence that both [Parents] were involved directly, and by omission, in the sexual exploitation of [Child] who, unquestionably, is significantly traumatized.

Trial Court Opinion, 4/9/24, at 12-13.

Given the exhaustive description of Child's various disclosures recited above, we need not belabor this analysis. The testimony at the hearings overwhelmingly supports the trial court's conclusion that Child was the victim of abuse perpetrated, or permitted, by Parents. In Child's various disclosures to Ms. Evans-Freet, A.F., Foster Parents, Ms. Winebrenner, and Ms. Sigel, Child described serial instances of gross sexual imposition, while naming both Parents as participants in those assaults. Indeed, Ms. Evans-Freet opined that Child's troubling disclosures, overly sexualized behavior, and tendency to

experience dissociative episodes led Ms. Evans-Freet to conclude that Child had been sexually abused by Parents. *See* N.T., 10/10/23, at 143.

Overall, we observe no abuse of discretion or error of law in the trial court's findings pursuant to Section 6303(b.1). No relief is due.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/24/2024